697 P.2d 425

Von C. BLACKBURN, as an Individual and as Guardian ad litem for Alan Von Blackburn, Lori Jo Blackburn and Thomas Von Blackburn, Plaintiff-Appellant,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, Defendant-Respondent.

No. 15142.

Supreme Court of Idaho.

Feb. 14, 1985.

Larry Robert Duff, of Goodman & Duff, Rupert, for plaintiff-appellant.

John A. Doerr, of Doerr & Trainor, Twin Falls, for defendant-respondent.

Kim Jay Trout and Stephan C. Rice, Lewiston, for amicus curiae, Idaho Trial Lawyers Association.

SHEPARD, Justice.

This is an appeal from a summary judgment rendered against plaintiff-appellant Blackburn in an action brought by Blackburn against his insurance carrier under the uninsured motorist coverage of an insurance policy. We affirm.

The facts are stipulated and we are presented solely with a question of law. Two cars containing members of the Blackburn and Day (not parties to this action) families were stopped in a highway emergency lane when a car driven by Ellsworth struck them. The negligence of Ellsworth was the proximate cause of the accident. Blackburn's wife and one of his children were killed and two of his other children injured. One member of the Day family was killed and others were injured. Ellsworth carried liability insurance with Farmers Insurance Exchange in the minimum amounts of $10,000 per person, $20,000 per occurrence, as then required by the Motor Vehicle Safety Responsibility Act, I.C. § 49–1505(d) [1].

1. 49–1505. Security required following accident unless evidence of insurance—Suspension for failure to deposit security—Exceptions.

．　　．　　．　　．　　．

(d) No such policy or bond shall be effective under this section unless issued by an insurance company or surety company authorized to do business in this state, except that if such motor vehicle was not registered in this state, or was a

Blackburn brought suit against Ellsworth and recovered a judgment in the amount of $150,000. Farmers Insurance Exchange tendered the $20,000 policy limits through settlement agreements with the Blackburn and Day families. Blackburn received $10,000 of that settlement.

Blackburn had purchased an insurance policy from respondent State Farm Mutual Automobile Insurance Company, which contained uninsured motorist protection of $15,000 per person, $30,000 per occurrence. That policy was in effect on the day of the accident, and provided coverage for Blackburn's family when they were passengers in a non-owned vehicle. Blackburn made a claim against State Farm under the uninsured motorist provision of his policy, and when that claim was denied, Blackburn initiated this action on behalf of himself and his children against State Farm on the theory that since Ellsworth had insufficient funds to compensate Blackburn for his damages, Ellsworth was an uninsured motorist. State Farm moved for summary judgment, which was granted by the trial court based on the ground that Ellsworth's compliance with the financial responsibility law precluded the conclusion that he was "uninsured." Upon appeal, the Idaho Trial Lawyers · Association sought and was granted permission to appear as amicus curiae.

The sole question to be determined is whether, as Blackburn asserts, the district court erred in its determination that the Ellsworth vehicle was not an "uninsured vehicle." The substance of the claim here is that the word "uninsured," as used in the applicable statutes and the insurance policy at issue here, must be construed to mean "underinsured" in relation to Blackburn's damages.[2] We disagree.

I.C. § 41–2502 requires a motor vehicle liability insurance policy to provide protection from injury by uninsured vehicles in amounts not less than the minimum limits for bodily injury or death required by the Motor Vehicle Safety Responsibility Act, I.C. § 49–1505(d), which coverage an insured may only expressly reject in writing. At the time of the accident, the Motor Vehicle Safety Responsibility Act, I.C. § 49–1505(d), required coverage of at least $10,000 for bodily injury to or death of one person and $20,000 for bodily injury to or death of two or more persons in any one accident. Hence, Blackburn's damages were caused by a motorist who had in effect at the time of the accident a policy that fully complied with I.C. § 41–2502 and the tortfeasor's insurer did not deny coverage, but rather tendered the $20,000 per occurrence limit.

A basic tenet in statutory construction is to ascertain and give effect to the legisla-

motor vehicle which was registered elsewhere than in this state at the effective date of the policy or bond, or the most recent renewal thereof, such policy or bond shall not be effective under this section unless the insurance company or surety company if not authorized to do business in this state shall execute a power of attorney authorizing the director to accept service on its behalf of notice or process in any action upon such policy or bond arising out of such accident; provided, however, every such policy or bond is subject, if the accident has resulted in bodily injury or death, to a limit, exclusive of interest and costs, of not less than ten thousand dollars ($10,000) because of bodily injury to or death of one (1) person in any one (1) accident and, subject to said limit for one (1) person, to a limit of not less than twenty thousand dollars ($20,000) because of bodily injury to or death of two (2) or more persons in any one (1) accident, and, if the accident has resulted in injury to or destruction of property, to a limit of not less than five thousand dollars

($5,000) because of injury to or destruction or [of] property of others in any one (1) accident."
This section was amended in 1983 to require insurance in amounts of $25,000/$50,000/$15,000.

2. We note that a growing number of states now have statutory reference to *underinsured* motorist coverage. These states include: Arizona, Connecticut, Florida, Georgia, Iowa, Louisiana, Maine, Minnesota, New Hampshire, New Mexico, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Virginia, Washington.

There are basically two types of statutory definitions of underinsured motorists. One focuses on whether the tortfeasor's policy limits are less than the victim's uninsured coverage, *e.g.*, Tex. Ins.Code Ann. art. 5.06–1(.5)(1981). The other type focuses on whether the damages suffered by the insured victim are greater than the tortfeasor's policy limits, *e.g.*, Washington Revised Code § 48.22.030(1) (1984).

ture's intent in passing a statute. *Webster v. Board of Trustees of School District No. 25, Bannock County*, 104 Idaho 342, 659 P.2d 96 (1983). In 1947, the legislature enacted the "Idaho Safety Responsibility Act," supplementing the motor vehicle laws of the State of Idaho. Proof of financial responsibility was defined under that act in "per occurrence" terms, and required $5,000 insurance coverage for bodily injury to or the death of one person in any one accident and $10,000 for bodily injury to or the death of two or more persons in any one accident. In 1961, the legislature increased the minimum amounts required for proof of financial responsibility to $10,-000/$20,000. 1961 Idaho Sess.Laws, ch. 136, § 2, p. 198. In 1967, the legislature enacted I.C. § 41–2502, making it mandatory that motor vehicle insurance policies provide each policyholder with coverage for bodily injury or death by uninsured motor vehicles in the minimum amounts required by the financial responsibility law. I.C. § 41–2503, § 41–2504 were also added defining "uninsured motor vehicle" to include one covered by an insurer who is or becomes insolvent within one year after an accident. 1967 Idaho Sess.Laws, ch. 61, § 1–3, pp. 124–126. In 1983, the legislature again increased the minimum amounts required for proof of financial responsibility to insurance coverage of $25,000/$50,-000, still couching the amount in "per occurrence" terms. 1983 Idaho Sess.Laws, ch. 199, § 3, p. 539.

We find nothing to indicate any legislative intent that the term "uninsured" should be construed to mean "underinsured" as asserted by the appellant here. To the contrary, the plain meaning of the statutes would appear to militate against the argument of Blackburn since the tortfeasor Ellsworth was covered with statutorily sufficient insurance, was thus "insured" rather than "uninsured."

The question presented has been the subject of substantial litigation. *See* Annot., 24 A.L.R. 4th 13 (1983). Blackburn argues that this Court should follow the reasoning of the Arizona and Hawaii Supreme Courts which have held that their uninsured motorist insurance statutes require coverage by a claimant's own insurer whenever the per person minimum required by their state's financial responsibility laws is *unavailable* from the tortfeasor's insurer due to the number of claimants seeking recovery. *See Porter v. Empire Fire and Marine Ins. Co.*, 106 Ariz. 274, 475 P.2d 258 (1970), *modified on other grounds*, 106 Ariz. 345, 476 P.2d 155 (1970); *Palisbo v. Hawaiian Ins. & Guaranty Co.*, 57 Hawaii 10, 547 P.2d 1350 (1976).

In *Porter*, the plaintiff was one of several victims of an accident caused by a negligent motorist who carried only the minimum amount of insurance required by the Arizona statute. Porter's pro rata recovery from the tortfeasor's insurer was $2,500. That amount was insufficient to compensate Porter for his damages, and he then sought to recover under his own policy which covered him against damage by an uninsured motorist, arguing that he was entitled to the difference between the statutory minimum of $10,000 and the $2,500 he had recovered from the tortfeasor's insurer. The Arizona Court agreed and held that the tortfeasor was "uninsured" as to the amount available to the claimant as contrasted with the minimum amount of the financial responsibility act and thus permitted recovery. The Hawaii Court in *Palisbo* followed the *Porter* rationale and adopted that judicially defined concept of "uninsured." The *Palisbo* Court in dicta also indicated that in cases of a contractual agreement between the insurance carrier and the uninsured motorist policyholder for coverage in excess of the minimum amount specified by the financial responsibility law, recovery of that greater amount would follow.

The reasoning of the Court in *Porter* as approved in *Palisbo, see also, Yamamoto v. Premier Ins. Co.*, 668 P.2d 42 (Hawaii App.1983), is powerful and persuasive, particularly wherein it is observed that those plaintiffs would have been in a better position if the tortfeasor had carried no liability insurance whatsoever rather than carrying the statutory minimum amount of cover-

age. It is our view, however, that the reasoning of the Arizona and Hawaii Courts is seriously flawed in ignoring the clear language of the legislation. It is argued that the legislature could not have intended such an anomolous result. On the other hand, it can be argued with equal force that the legislature had the opportunity to consider the result that would flow from its use of specific language, as is reflected by the legislative amendment which considers the circumstance of a tortfeasor's insurance carrier becoming insolvent. The legislature has provided for a different result in that circumstance. The anomoly which is present in cases such as this is a result of the unfortunate legislative policy of tying the uninsured motorist statute directly to the financial responsibility law, which provides for a "per accident" limit.

A host of courts has considered the problem and an overwhelming majority of those courts have rejected the rationale adopted in *Porter* and *Palisbo*. *Chafin v. Aetna Ins. Co.*, 550 F.2d 575 (10th Cir. 1976) (applying New Mexico law); *Criterion Ins. Co. v. Anderson*, 347 So.2d 384 (Ala.1977); *Travelers Ins. Co. v. Bouzer*, 39 Cal.App.3d 992, 114 Cal.Rptr. 651 (1974); *Simonette v. Great American Ins. Co.*, 165 Conn. 466, 338 A.2d 453 (1973); *State Farm Mutual Auto. Ins. Co. v. Hallowell*, 426 A.2d 822 (Del.1981), *aff'd*, 443 A.2d 925 (Del.1982); *Golphin v. Home Indemnity Co.*, 284 So.2d 442 (Fla.App.1973); *Cotton States Mutual Ins. Co. v. Austin*, 143 Ga. App. 309, 238 S.E.2d 253 (1977); *Ripley Resin Eng'r Co. v. Great American Ins. Co.*, 70 Ill.App.3d 619, 27 Ill.Dec. 209, 388 N.E.2d 1258 (1979); *Detrick v. Aetna Casualty & Surety Co.*, 261 Iowa 1246, 158 N.W.2d 99 (1968); *Wren v. Ohio Casualty Ins. Co.*, 535 S.W.2d 849 (Ky.1976); *Richard v. Zurich Ins. Co.*, 318 So.2d 83 (La. App.1975); *Saari v. State Farm Mutual Auto. Ins. Co.*, 72 Mich.App. 278, 249 N.W.2d 390 (1976); *DiLuzio v. Home Mutual Ins. Co.*, 289 N.W.2d 749 (Minn.1980); *McMinn v. New Hampshire Ins. Co.*, 276 So.2d 682 (Miss.1973); *Brake v. MFA Mutual Ins. Co.*, 525 S.W.2d 109 (Mo.App.

1975), *cert. denied*, 423 U.S. 894, 96 S.Ct. 192, 46 L.Ed.2d 126 (1975); *Emery v. State Farm Mutual Ins. Co.*, 195 Neb. 619, 239 N.W.2d 798 (1976); *Peacock v. Harper*, 95 Nev. 596, 600 P.2d 223 (1979); *Allstate Ins. Co. v. O'Shaughnessy*, 118 N.H. 66, 384 A.2d 486 (1978); *Tucker v. Peerless Ins. Co.*, 41 N.C.App. 302, 254 S.E.2d 656 (1979); *Shelby Mutual Ins. Co. v. Smith*, 45 Ohio St.2d 66, 341 N.E.2d 597 (1976); *Simmons v. Hartford Accident & Indemnity Co.*, 543 P.2d 1384 (Okla.1975); *Lund v. Mission Ins. Co.*, 270 Or. 461, 528 P.2d 78 (1974); *Ziegelmayer v. Allstate Ins. Co.*, 121 R.I. 818, 403 A.2d 653 (1979); *Kemp v. Fidelity & Casualty Co. of New York*, 512 S.W.2d 688 (Tex.1974); *Tudor v. Allstate Ins. Co.*, 216 Va. 918, 224 S.E.2d 156 (1976); *Strunk v. State Farm Mutual Auto Ins. Co.*, 90 Wash.2d 210, 580 P.2d 622 (1978); *Scherr v. Drobac*, 53 Wis.2d 308, 193 N.W.2d 14 (1972).

"Uninsured" clearly is not identical to "underinsured" and a court should not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. Words do not become ambiguous simply because lawyers and laymen contend for different meanings. *Simonette v. Great American Ins. Co.*, 165 Conn. 466, 338 A.2d 453 (1973).

As stated by the *Simonette* Court in refusing to read additional meaning into the unambiguous language of the uninsured motor vehicle statute,

"A due regard for the differing functions of the legislative and judicial branches of government requires that the courts refrain from rewriting, under the context of interpretation, the clearly expressed language of a legislative enactment which the court deems to be preferable to that which the legislation requires. 'In the field of legislation, the legislature is supreme. Courts must apply legislative enactments according to their plain terms'." *Id.* [citations]; *e.g., Lotoszinski v. State Farm Mutual Auto. Ins. Co.*, 417 Mich. 1, 331 N.W.2d 467 (1982).

It is here argued that the statute mandating the availability of uninsured motorist coverage should be construed to accomplish the remedial purposes of providing coverage for injuries which would otherwise go uncompensated, and to provide protection to a person injured by an "uninsured" motorist equal to the protection that the injured plaintiff would have enjoyed if the tortfeasor carried liability insurance in an amount equal to the uninsured motorist coverage. We do not view the statute as embodying such a policy. The court in *Criterion Ins. Co. v. Anderson*, 347 So.2d 384 (Ala.1977), dealt with a similar argument and distinguished *Porter* by pointing out that it failed to take into account the statutory provisions for a per accident minimum amount of $20,000, and stated:

"We think that assumption [that the policy of the uninsured motorist statute is to assure to each injured party the availability of a minimum of $10,000 coverage] to be incorrect. That statute mandates a minimum of $10,000 coverage *only* in the case of accidents resulting in bodily injury to or the death of one person. Where an accident results in bodily injury to or the death of two or more persons, the statute mandates a minimum coverage of $20,000 for the accident. The statute clearly contemplates situations in which the recovery of each individual might be less than $10,-000. It appears, therefore, that the *policy* behind the statute is to assure the availability of minimum coverage for each accident, not for each injured person." *Id.* at 386.

It is also argued that a narrow construction of the uninsured motorist statute denies the benefit of the uninsured motorist protection for which the carrier and the insured bargained. Here Blackburn demands the benefit of his bargain with State Farm for uninsured motorist protection in excess of the statutory minimum.

A similar argument was made to the Arizona Supreme Court in *State Farm Mutual Auto. Ins. Co. v. Eden*, 136 Ariz. 460, 666 P.2d 1069 (1983). Eden carried uninsured motorist coverage of $50,000/$100,-000. An amendment to the Arizona uninsured motorist statute required insurers to offer uninsured motorist protection in amounts three times that of the minimum amounts required by the financial responsibility law. Eden had recovered $15,000 from the tortfeasor's insurance company, which was the minimum "per person" amount under Arizona's safety responsibility act. Eden made claim under the uninsured motorist coverage of his insurance policy for the difference between the $15,-000 recovered from the tortfeasor and his damages alleged to be $50,000. Upon denial, Eden brought action arguing that under the "Porter" concept of "uninsured," the tortfeasor was uninsured since he was insured for less than $45,000. Eden argued that he was entitled to an additional $30,-000 under his uninsured motorist coverage. The court disagreed and denied recovery, stating:

"If our legislature had intended to create a sliding-scale, after-the-fact, severity-of-the-injury-determined concept of when a motor vehicle was or was not insured and to what extent, it would have expressed itself in appropriate language. [citations] ... The obvious way to increase the amount of guaranteed [uninsured motorist] protection would have been to increase the limits set by [the financial responsibility law]. This the legislature did not do; for us to adopt appellant's definition of 'uninsured' would constitute an expansion of the statute. The statutes have never limited the amount of uninsured motorist coverage a company can offer their purchasers. *State Farm Mutual Ins. Co. v. Edgington*, 13 Ariz.App. 374, 476 P.2d 895 (1970). The purpose of section (B) was simply to require insurance companies to make increased amounts of protection available against the uninsured motorist; we find no indication that the legislature intended by this section to redefine 'uninsured' ... The Edens recovered $15,000, the minimum amount set forth in the Financial Responsibility Act, from the negligent motorist's insur-

ance company. While our holding puts appellant in the position of being worse off because he was struck by a motorist with the minimum required amounts of liability insurance rather than by one with no insurance at all, that risk was inherent in the statutes and in the insurance contract." *Eden,* 666 P.2d at 1071–1072.

In sum, we are asked to reconstruct I.C. § 41–2502 to define "uninsured motor vehicle" as a vehicle whose coverage, no matter how large, is inadequate to compensate for the damages suffered by the injured party. We hold that there is no ambiguity in the applicable statutes nor any indication of legislative intent such that would permit us to so interpret into the statutes that significant addition to the coverage required. *See Peacock v. Harper,* 95 Nev. 596, 600 P.2d 223 (1979).

We do note, however, the anomoly presented by the circumstances, particularly that a holder of a policy containing uninsured motorist coverage may well be in a better position if a tortfeasor carries no insurance whatsoever rather than carrying the minimum coverage mandated by the statute. We note that the matter deserves legislative attention. While this Court could follow the example of the *Porter* and *Palisbo* decisions, such clearly would be to indulge in judicial legislation under the guise of statutory interpretation. In actuality, we are called upon to make a decision of policy. Such a policy decision should rest on factors militating for or against that decision. It may well be that the adoption of such a policy would result in an increase of insurance costs to the motoring public. That increase may be a large amount or a small amount. It may be that such a possible increase in premium is well warranted to protect against the results that presently flow from multiple victim accidents, the victims of which must go largely or partially uncompensated for their damages because of a quirk in the insurance laws. However, all of such questions should be dealt with on the basis of adequate information (little of which is before this Court) by a legislative body

equipped and authorized to make such policy decisions. Again, we urge legislative attention to the inequitable results which flow from the language of our statutes.

The amicus curiae argues that the Motor Vehicle Safety Responsibility Act is unconstitutional on equal protection grounds, *i.e.,* that it does not provide protection or extend benefits equally to the motoring public that travels in groups. Amicus contends this Court should void the "per occurrence" limit of liability contained in the act, and thus make each victim of an accident entitled to reimbursement from the negligent motorist's liability policy to a minimum amount of $10,000, regardless of the number of victims involved in any one accident. We decline the invitation. Questions concerning the constitutionality of the Motor Vehicle Safety Responsibility Act were not raised by the pleadings nor argued or decided by the lower court and will not be considered for the first time on appeal. *Oregon Shortline Railroad Co. v. City of Chubbuck,* 93 Idaho 815, 474 P.2d 244 (1970). An amicus must take a case as he finds it without attempting to inject new issues or to tailor the case to suit his needs. *Bogert v. Kinzer,* 93 Idaho 515, 465 P.2d 639 (1970). Hence, we do not consider the argument raised by amicus. *See Coburn v. Seda,* 101 Wash.2d 270, 677 P.2d 173 (1984).

The judgment of the trial court is affirmed. Costs to respondent. No attorney's fees allowed upon appeal.

DONALDSON, C.J., and BAKES, J., concur.

HUNTLEY, Justice, dissenting

I would reverse the judgment of the trial court with instructions that the appellant be permitted to recover the total of available uninsured motorist coverage plus the sum recovered from Farmers Insurance Company, for the reasons and analysis set forth in *Hanlon v. Buckeye Union Insurance Company,* 324 N.E.2d 598 (Ohio 1975) and *Porter v. Empire Fire and Marine*

*Insurance Company,* 106 Ariz. 275, 475 P.2d 258 (1970).

In *Hanlon, supra,* the Court stated the issue:

Does a person, injured in an automobile collision, who is insured under the so-called uninsured motor vehicle coverage of an automobile policy lose his right to recovery on that coverage where the offending driver has bodily injury liability coverage at the time of the accident in at least the amount specified by the Financial Responsibility Law but the company writing the policy denies that there is any coverage thereunder applicable to the injured person because the total of the amount specified in the policy of the offending driver has been expended to other persons who were injured in the same collision?

The *Hanlon* Court, in determining that the insured does have coverage under circumstances such as prevail in the instant case, reasoned in part as follows:

It is elementary that uninsured means uninsured insofar as a particular injured person is entitled to recover thereon; i.e. it is not possible for him to recover any liability insurance monies.

It would be ridiculous to hold that although a tortfeasor may be a party to a writing—an automobile liability coverage policy—but the company denies recovery thereon so far as a victim is concerned, that an uninsured policy holder could neither collect on the coverage for which he paid or collect on the liability coverage of the tortfeasor.

The only logical and reasonable construction that may be given the policies and the statute is one construing them to mean that if the offending driver does not have liability coverage available to the injured insured in limits for bodily injury set forth in Revised Code Section 4509.20, that the uninsured motorist coverage is applicable to such insured up to the limits stipulated in his policy.

In arriving at such construction, we find that statements in the opinion of the Court of Appeals of Summit County,

Ohio, in Case No. 7571, *Primes v. Tyler,* wherein that Court held that the Ohio Guest Act was unconstitutional are pertinent to the issues herein, particularly with reference to the requirements that the scope of the review of the statute should be a determination as to whether the legislation had a rational relation to the object sought to be attained.

Certainly in construing a contract of insurance a Court should determine whether a proposed construction of it has a rational relation to the object sought to be attained by it. There can be no question but that the object sought to be attained by the contracts and the statute herein is to make available to an injured insured the full amount of his damages up to the minimum amount prescribed by the Financial Responsibility Act, whether the sum is recoverable from a tortfeasor's liability policy or the injured uninsured coverage or both. Although this case primarily turns upon the construction of insured contracts, the statute, Revised Code Section 3937.18 also bears upon the issues, and the construction of such statute is proper herein.

We are concerned in the instant case with the question of whether an interpretation which excludes a party from participating in the benefits for which he paid insurance premiums—solely for his own benefit—is reasonable; whether there is a rational relationship between the application of the legislation and the contracts as contended by defendants, and the objects sought to be attained by the contract and the statute.

We are also concerned herein with the question as to whether the construction of Revised Code Section 3937.18 as contended by the defendants is manifestly discriminatory under the equal protection clause of the Fourteenth Amendment to the Constitution of the United States; and whether a construction of an insurance contract so as to exclude a party to the contract (one who paid the premiums for such coverage) from its benefits is so unreasonable as to be contrary to the

public policy of Ohio and so as to mandate an interpretation of it as contended by parties thereto, i.e. the plaintiffs herein, and thereby afford the protection that the purchaser of the coverage understood he would receive. (At pages 602 and 603).

. . . .

It is not logical or just to hold that an insured motorist's right to recover on the contract that is between himself and his insurance company be voided, or its application be affected by, or dependent upon the question as to which of several persons who are injured in a collision, as has occurred in the instant case, gets to the courthouse first.

We repeat, it definitely is not consistent with the public policy of Ohio to so construe a contract or a statute as to hold that a person's right to recover benefits for which he paid a premium is eliminated because some other person gets to the courthouse before he does or because some other party failed to have unlimited liabilities insurance coverage. (At page 605).

Lest the insurance industry construe this dissent as evidence of the correctness of a false perception held by another member of this Court regarding my attitudes, a word is in order. Justice Bakes, in his dissent from an opinion I authored recently released stated:

"Viewed in this way, the majority opinion appears for what it really is, a thinly disguised assault upon liability insurance

carriers." *Farmers Insurance Group v. Reed and Hamilton*, (Idaho Dec. 31, 1984), Slip Opinion No. 176.

To so cast the issue is to misapprehend the operation of the insurance industry. My understanding is that the insurance industry is in business to make a profit on the insuring against risks.

Insurance companies have underwriting departments which adjust premiums to make a profit on the risks covered. When a court or legislature requires the coverage of additional risks, the opportunities for the insurance industry to generate profit are increased. Thus it is sophistry, and unproductive, for the dialogue in these cases to be cast into a pro or anti industry mold.

BISTLINE, Justice, dissenting.

I am at a loss to understand the majority's utilization of I.C. § 49–1505(d) as having any application to this case. That section has never required compulsory automobile liability (indemnity) insurance. Indirectly requiring such insurance, that section and the remainder of the Motor Vehicle Safety Responsibility Act, Title 49, ch. 15, requires a motorist involved in a collision to post security with the director of the Department of Law Enforcement which in the latter's judgment will be sufficient to satisfy any judgment, or judgments, which might result from the collision. If the motorist fails to do so, the director is authorized to suspend his driver's license and the registration of his involved vehicle.[1]

1. Subsequent to writing the foregoing, and in connection with reviewing the *Strunk* case, discussed *infra*, I observed that a unanimous Supreme Court of Washington recently made the same analysis:

While the act does not require mandatory insurance coverage, it nevertheless conveys a strong public policy implicit in its provisions. Quite simply, the statute creates a strong public policy in favor of assuring monetary protection and compensation to those persons who suffer injuries through the negligent use of public highways by others. This public policy is clearly demonstrated by the manner in which the statute operates.

The financial responsibility act does not require an individual to prove that he is finan-

cially able to compensate those he may injure through the use of his vehicles until he is involved in an automobile accident resulting in bodily injury or death of any person or property damage of $300 or more. RCW 46.-29.060. If such an accident occurs, the two-pronged approach of the financial responsibility act comes into play.

First, if the injured or damaged person[s] submits information indicating the extent of injuries or damage within 180 days of the accident, the other party must demonstrate financial responsibility to the injured or damaged person[s]. RCW 46.29.070(2). Unless the individual already carries liability insurance coverage or an demonstrate financial responsibility in some other manner, *see* RCW 46.29.080, he must post an

However, the Act does not apply if the motorist had in effect a liability policy in the minimum amount required by subparagraph (d)—footnote 1 to the majority opinion. These provisions of the Act have been with us since 1947, and have no concern whatever with uninsured motorist coverage. The Insurance Code, § 41–2501 *et seq.*, was amended in 1967 to add I.C. § 41–2502, *et seq.*, seeking *to provide protection* for persons injured and "legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury ..." including death. To effectuate this benevolent policy, insurers in Idaho vending liability insurance were required to offer such uninsured motorist protection in the same amounts as set by I.C. § 49–1505, as amended from time to time. Such is the *total involvement* of § 49–1505—only to set the minimum amounts which must be *offered.*

With that understanding, one then turns to the facts of this case. As Justice Shepard notes in the opinion for the Court, the tortfeasor, Ellsworth, had a Farmers' Insurance policy which would indemnify him only to the extent of $10,000 per person or $20,000 per occurrence. Blackburn's judgment against Ellsworth, however, was $150,000. Manifestly a $150,000 judgment cannot be paid out of the $20,000. To which must be added that the Day family also had claims against Ellsworth for one death and four injured persons. [The parties have stipulated that all deaths and all injuries were proximately caused by the negligence of Ellsworth.]

amount of security ... sufficient ... to satisfy any judgment or judgments for damages resulting from such accident as may be recovered against each driver or owner.
RCW 46.29.070(1).

Second, the financial responsibility act requires the individual to demonstrate "financial responsibility for the future". This term is defined by the act as follows:

*Proof of ability to respond in damages for liability, on account of accidents occurring subsequent to the effective date of said proof,* arising out of the ownership, maintenance, or use of a vehicle ...

(Italics ours.) RCW 46.29.260. The individual may demonstrate financial responsibility for the future by: (1) filing a certificate of insurance; (2) posting a bond; (3) depositing securities in the amount of $60,000; or (4) providing a certificate of self-insurance. RCW 46.29.450. As a practical matter, the first method represents the only way most people can comply with the second prong of the act.

This brief review of the statutory scheme should make one thing very clear—the act will not apply until the need arises to assure an adequate pool of funds for compensation. Thus, to the greatest extent possible without requiring mandatory insurance coverage, the legislature has demonstrated its intended policy of providing adequate compensation to those injured through the negligent use of this state's highways. In *LaPoint v. Richards,* 66 Wash.2d 585, 403 P.2d 889 (1965), we recognized that the intended purpose of the financial responsibility act is

for the benefit of owners and drivers of motor vehicles ... and, *more fundamentally,* [it is] *designed to give monetary protection to that ever changing and tragically large group of persons who, while lawfully using the highways themselves, suffer serious injury through the negligent use of those highways by others.* (Italics ours.) *LaPoint,* at 590, 403 P.2d 889.

The policy of providing compensation to victims is borne out by the financial responsibility act's focus on those who have been injured by a driver in the past *and* those who may be injured by him in the future. In each of the two prongs of the financial responsibility act, there is a requirement that some source of funds be made available to redress the victims of automobile accidents.

This strong public policy of assuring protection to the innocent victims of automobile accidents was previously recognized by this court in *Touchette v. Northwestern Mut. Ins. Co.,* 80 Wash.2d 327, 332, 494 P.2d 479 (1972), where in interpreting the uninsured motorist statute, we said:

[The uninsured motorist statute] is but one of many regulatory measures designed to protect the public from the ravages of the negligent and reckless driver .... *The statute is both a public safety and a financial security measure. Recognizing the inevitable drain upon the public treasury through accidents caused by insolvent motor vehicle drivers who will not or cannot provide financial recompense for those whom they have negligently injured, and contemplating the correlated financial distress following in the wake of automobile accidents and the financial loss suffered personally by the people of this state, the legislature for many sound reasons and in the exercise of the police power took this action to increase and broaden generally the public's protection against automobile accidents.*
*Mutual of Enumclaw Insurance Co. v. Wiscomb,* 97 Wash.2d 203, 643 P.2d 441 (1982) (emphasis original).

But, as Justice Shepard points out, Blackburn's own liability policy with State Farm Insurance provided uninsured motorist coverage in the amount of $30,000. As the law required, State Farm had offered such coverage when Blackburn was sold his policy, and Blackburn accepted the offer, purchased the coverage, and, of course, would have paid a premium for this additional coverage. For the money Blackburn paid for this coverage, under the holding of the majority of the Court, Blackburn recovered absolutely nothing—certainly a far cry from what he, as a reasonable person, would <u>have understood</u> from the language of his policy and certainly a far cry from what he <u>would expect</u> from the policy he had purchased.

The underlining in the foregoing passage is to introduce the language of the Court's decision in *Foremost Insurance Co. v. Putzier*, 102 Idaho 138, 627 P.2d 317 (1981):

> Moreover, although the doctrine of reasonable expectations is not the law in Idaho, there is the closely analogous rule of contract construction pointed out by Justice Donaldson in his opinion in *Corgatelli v. Globe Life & Accident Co.*, 96 Idaho 616, 533 P.2d 737 (1975), wherein, citing *Shields v. Hiram C. Gardner, Inc., supra,* he wrote:
>> "[t]he doctrine of probability or reasonableness has long been a rule of construction geared toward ascertaining intent in situations of ambiguity. The standard to be applied is what a reasonable person in the position of the insured would have understood the language to mean." 96 Idaho at 622, 533 P.2d at 743. (Donaldson, J., dissenting.)
>
> 102 Idaho at 142, 627 P.2d at 321 (emphasis original).

Most people that I know who have purchased insurance policies, and they are all reasonable people, would here understand that they had purchased a liability policy which, in case of damages arising from vehicular collision would pay the sum specified therein if a negligent driver had insufficient insurance to cover the damages which he caused, although it is equally true that this might not be so if the insurance agent selling the policy was careful to point out that uninsured and underinsured are, in the insurance trade and usage, not synonomous.

Noting that in the *Foremost* case I was one of the majority there adopting as Idaho case law the above-quoted language of Justice Donaldson, I join other members of the bench and bar who have been hard-pressed to find any distinction between that portion of Justice Donaldson's opinion and Justice Shepard's *Corgatelli* opinion wherein the latter wrote:

> The doctrine of reasonable expectations proceeds from an acceptance of the fact that most insurance policies are contracts of adhesion. Ordinarily there can be no bargaining over the terms of the contract. The buyer either accepts the policy as written or turns elsewhere where he will usually be confronted with the same dilemma resulting from same terminology. If the layman actually studies the contract he usually becomes bewildered and/or uncertain as to the terminology. He expects that he will be generally insured and does not anticipate these expectations will be upset by an artfully drawn clause that he will be unable to detect or, in the event detected, will be powerless to modify. Indeed, this court can take notice that usually an insured never sees his policy until after he has paid his premium and the contract has been formed.
>
> . . . .
>
> The doctrine of reasonable expectations is peculiarly applicable to contracts where as here it is drawn in such a fashion that one hand steals away what the other seemingly confers. A close analysis of the literal meaning of the words in the provision in question solves none of the problems since the literal language is at odds with the reasonable expectations an insured would obtain from the contract.
>
> *Corgatelli, supra,* 96 Idaho at 619–21, 533 P.2d at 740–41.

As is readily noted, putting ambiguity aside, where Justice Donaldson (and the *Foremost* majority) endorsed "the doctrine of probability or reasonableness," Justice Shepard's terminology was "the doctrine of reasonable expectations." Justice Donaldson declared the applicable standard to be what a reasonable insured would have understood; Justice Shepard wrote the applicable standard to be what a layman reasonably expected. If there is a difference, show me. As I said above, other than where the insurance salesman has carefully advised the purchaser of insurance what his policy provides, it is inescapable that *an insured's expectations are going to be based on what he understood* that he was buying. If there is not any difference, *and even were there not a clear legislative directive of public policy involved,*[2] the Court this day should, on the strength of *Foremost* and on the strength of Justice Shepard's *Corgatelli* language, at the least reverse the summary judgment and remand to the trial court to ascertain wheth-

er Blackburn was a reasonable man and develop also what was his understanding (per Donaldson, C.J.), and what were his expectations (per Shepard, J.). That is the least that the Court should do.

At the best, where the legislature had already sufficiently evidenced the purpose of § 41–2502, the district court judgment should be reversed with directions to direct entry of judgment in favor of Blackburn as prayed for in his complaint. If there is clear legislative directive of public policy, or even if the directive is only reasonably clear, I read Justice Shepard's opinion as intimating preference for being persuaded by the reasoning of the Supreme Courts of Hawaii and Arizona. Justice Shepard comes extremely close to point where he observes "the circumstance of a tortfeasor's insurance carrier becoming insolvent." His statement is in reference to I.C. § 41–2503. This section was not an amendment to § 41–2502; both were enacted at the same time. *See* S.L.1967, p. 124.

---

Section 2. That Chapter 25 of Title 41, Idaho Code, be, and the same is hereby amended by adding a new section thereto, following Section 41–2502, to be known and designated as Section 41–2503, and to read as follows:

*41–2503. For the purposes of this coverage, the term "uninsured motor vehicle" shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency.*

1967 Idaho Sess. Laws, p. 124.

41–2503. **"Uninsured motor vehicle" defined.**—For the purposes of this coverage, the term "uninsured motor vehicle" shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency. [I.C. § 41–2503, as added by 1967, ch. 61, § 2, p. 124.]

Idaho Code, Vol. 7B, p. 289.

---

As readily appears, "Uninsured motor vehicle defined" is not part of the enactment, but rather amounts to no more than the codifiers' erroneous perception of the content of § 41–2502. It is not and does not purport to be a definition of uninsured motor vehicle. There is none. There is a policy definition.

What § 41–2502 does is to create the fiction that an insured motor vehicle is *not*

an insured motor vehicle when, although the tortfeasor has a policy of insurance, nevertheless, no proceeds are available to the tortfeasor's victims. Hypothetically applied to the instant case, if Farmers Insurance were discovered to be insolvent so that its policy issued to Ellsworth was worthless to Ellsworth and his victims, Ellsworth would be *deemed* to have operated an uninsured motor vehicle—absolutely

2. As discussed *infra*, I submit that there is.

and unequivocally the net result, whereby *the section makes certain that Blackburn is not denied the benefit of the uninsured motorist protection which was offered and which he accepted and paid for.* It is difficult to conceive of a more definitive directive of legislative intent and purpose— otherwise put, a declaration of this state's public policy. Although someone in the legislature had evidently experienced an insurance company becoming insolvent, and the legislature responsibly and carefully protected against that eventuality, unfortunately no one in the legislature (and no one whom I have ever known) had ever experienced an accident with such horrendous consequences as this. Accordingly, nothing specific was legislatively declared which covers the situation. But, at least in § 41–2503 we do have a clear legislative directive that the public policy of Idaho is to have the benefit of what is paid for. Granted benefit of that directive, I am at a loss to understand the view that we pathetically decry our inability to do no better than to "note that the matter deserves legislative attention." As Justice Huntley points out in his opinion, the courts of Arizona and Hawaii have not been so pussy-footed. The decisions which he cites were each unanimous. Justice Shepard in his opinion concedes that Hawaii is in accord with Ohio and Arizona, saying of the Hawaii reasoning that it is "powerful and persuasive particularly wherein it is observed that those plaintiffs would have been in a better position if the tortfeasor had carried no liability insurance ... whatsoever ...."

Where the opinion of Justice Shepard goes awry, as I view it, is in picking up on some of the language in the briefs and seeing "the substance of the claim here is that the word 'insured' as used in the applicable statutes and the insurance policy at issue here, must be construed to mean 'underinsured in relation to Blackburn's damages.'" Such, however, would be result, not the contention. The real issue is whether Blackburn is entitled to recover from his own carrier, State Farm, where not available to him are the $30,000 of proceeds which did not flow to him from Ellsworth's policy. That is the issue—not whether Ellsworth should have had a larger policy.

A case relied upon in State Farm's brief illustrates the point more graphically. In that case, *Strunk v. State Farm Mutual,* 90 Wash.2d 210, 580 P.2d 622 (1978), the negligent driver was insured, as here, for $15,000 per person and $30,000 per occurrence. The collision killed a husband, his wife, and their one-year-old son. Two children survived, one injured seriously and permanently. The tortfeasor's insurance proceeds went $15,000 toward damages for the death of the father, $15,000 toward the death of the one-year-old, and that coverage was exhausted. Nothing whatever remained to go toward the damage claims for death of the mother; likewise nothing toward the damage claims for the injured children.[3] The *Strunk* court majority did not hinge their decision on the semantical distinction between "insured" and "underinsured"—saying only that "The tortfeasor was underinsured in her ability to respond to all of the horrendous damage caused, but she was not uninsured." Net result: That court said the tortfeasor was *not* un-

3. The facts of *Strunk* are virtually identical. Not only the same insurance carrier is defendant and the uninsured motorist coverage the same, but in both cases, although some money was paid by the liability carrier for the offending vehicle, some of the plaintiff's claims obviously remained uncompensated. The policy definitions of uninsured motor vehicle are identical:

> A land motor vehicle with respect to the ownership, maintenance or use of which there is in at least the amounts specified by the financial responsibility law of the state in which

the described motor vehicle is principally garaged, no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such vehicle, or with respect to which there is a bodily injury liability bond or insurance policy applicable at the time of the accident but the company writing the same denies that there is any coverage thereunder or is or becomes insolvent ....

R., p. 23–24.

insured, which was a true innocuous statement when considered in the abstract. *Strunk*, however, was an aberration in Washington's long string of vehicle insurance cases which began with *Dairyland Insurance Co. v. Ward*, 83 Wash.2d 353, 517 P.2d 966 (1974), and was still going strong in *Mutual of Enumclaw, supra.*

The guts of the *Strunk* majority opinion, and which precipitated out the aberration, was the majority's jumping to an erroneous conclusion of legislative intent—a conclusion wholly at odds with anything that court had written before, or would write thereafter. Because the legislature in the prior year had passed an amendment to RCW 48.22.030 to provide coverage against underinsured motorists, the majority saw that "this legislative amendment demonstrates that the existing law, applicable to this case, did not contemplate coverage as to the *under*insured motorist." *Strunk, supra,* 580 P.2d at 624.[4] Nothing, however, I repeat nothing, in the *Strunk* opinion suggests how that remarkable conclusion was "demonstrated" to the majority's satisfaction. That here was an *ipse dixit* if ever there was one is well demonstrated by the four-member dissent:

> The majority here argues that RCW 48.22.030 and .040 in effect provide a defense to the victims' own uninsured motorist policy carrier notwithstanding that carrier received a premium for the coverage and promised to provide it to its insured. It argues that this position is buttressed by two actions taken by the legislature. The first is the passage of Substitute House Bill No. 1348, 45th Session, 1st Ex.Sess., 1977, vetoed by the Governor July 15, 1977. According to the majority this amendment demonstrates that the existing law applicable to this case does not contemplate coverage to the so-called "underinsured" motorist. The word "underinsured" used by the

majority is not contained in our uninsured motorist statute. However, an ordinary man considering the word "underinsured" would surely think of a victim who receives some insurance, but not enough to fully compensate him for his injuries and losses. That, indeed, was the situation in all but three of the cases relied upon by the majority. In each of those cases but three, the persons seeking benefits under their uninsured motorist coverage policies had already received some compensation from the liability carrier of the offending vehicle.

In this case, moreover, the two plaintiffs have *received nothing whatsoever* from either the offending motorist or his liability insurance carrier, which has denied any liability to the plaintiffs. So far as plaintiffs are concerned, the offending vehicle *is* uninsured, not underinsured. For all we know, the legislature, in enacting the statute on which the majority relies, may have intended to make certain that this court not construe our uninsured motorist statutes as the majority does now. The precautionary amendment need not and should not be read as constituting a mandate that RCW 48.22.030 and .040 be construed literally and without regard to the intent and purpose of the statute as we have heretofore construed it to aid the victims of an accident.

In this connection I would point out that the liability insurance carrier here paid out all of the insurance proceeds to two of the four injured persons, *deliberately* leaving two injured persons without compensation. The insurance policy must therefore have implicitly recognied that no insurance would be available under that policy to some injured persons with valid claims. The policy itself recognized that, as to some injured persons,

4. State Farm's respondent's brief at p. 32, beginning with "The single question is" gives the appearance of purporting to proceed to set out the full text of the *Strunk* majority's discussion of the single question. However, and a factor which may have escaped and misled those who today comprise our majority, the brief omits 21

lines, including that which I have quoted above in my text, and does not disclose the omission—which reputable counsel should be extremely careful to avoid. Where the text of an opinion is presented as being in full, an appellate court should not ever feel constrained to compare the brief against the opinion.

the vehicle would indeed by uninsured because no insurance proceeds at all would be available.

The majority also argues that the express provision in the statute for recovery against the uninsured motorist carrier in the case of an insolvent liability policy carrier indicates that there was no intention to cover the case of the underinsured motor vehicle causing the accident. As pointed out above, this is not a case of an underinsured vehicle. Even if it were, the inference drawn by the majority does not necessarily follow. It is unreasonable to argue, in effect, that the legislature intended, by enacting statutes to assure payment to the innocent victims of an accident, to have its meaning construed in such a way as to diminish or eliminate the protection thus afforded. If the legislature had any intention beyond merely addressing the problem of the insolvent liability insurer, it is more reasonable to assume it intended to leave to the courts the task of carrying out the intent and purpose of the statutes as new problems arise.

*Strunk, supra,* 90 Wash.2d at 220, 580 P.2d at 628.

Four years after the *Strunk* aberration, in *Mutual of Enumclaw, supra,* an en banc Washington Supreme Court was back on track, relying upon most of its earlier authority which was set out by the four dissenters who in their *Strunk* dissent wrote:

"The phrase 'uninsured motor vehicles' is ambiguous, *i.e.,* capable of being construed in more than one way. That is evident from the facts here. The liability insurance carrier on the offending vehicle paid out all of the insurance proceeds to two of the four passengers injured in the accident. Plaintiffs are the two passengers who received no part of the proceeds. One of the plaintiffs was seriously and permanently injured. Plaintiffs contend that as to them the offending motor vehicle was uninsured. They claim they are therefore entitled to insurance benefits under the uninsured motorist coverage policy with defendant insurance carrier, a policy for which the defendant has received a premium. The defend-

ant, on the other hand, contends that because the offending motor vehicle carried liability insurance in some amount, it was not 'uninsured' within the meaning of the statute, even though plaintiffs could not receive any of those insurance benefits because all of the proceeds had already been paid to the other two accident victims. The majority opinion does not address the peculiar effects of the preferential payment of funds, a point we later discuss.

"What is the correct interpretation to be given the statutory language, 'uninsured motor vehicles?' Insofar as it is inconsistent with this language, the insurance policy must give way to that language. *Hartford Acc. & Indem. Co. v. Novak,* 83 Wash.2d 576, 520 P.2d 1368 (1974); *Touchette v. Northwestern Mut. Ins. Co.,* 80 Wash.2d 327, 332, 494 P.2d 479 (1972); *Brummett v. Grange Ins. Ass'n,* 4 Wash.App. 979, 981, 485 P.2d 88 (1971).

"This question of statutory construction has resulted in divided case law from other jurisdictions. The conflict is one between the cases that have adopted a literal construction of the phrase 'uninsured motor vehicles,' and cases that have adopted a functional or liberal construction.

"Under Washington law the primary and controlling role of statutory construction is to ascertain and apply the legislative intent and purpose of the language used. In *Amburn v. Daly,* 81 Wash.2d 241, 245–46, 501 P.2d 178, 181 (1972), this court stated the rule we follow:

The courts, in pursuance of the general object of giving effect to the intention of the legislature, are not controlled by the literal meaning of the language of the statute, but the spirit or intention of the law prevails over the letter thereof, and no construction should be given to a statute which leads to gross injustice or absurdity.

*Accord, In re Estates of Donnelly,* 81 Wash.2d 430, 436–37, 502 P.2d 1163 (1972); *Palisbo v. Hawaiian Ins. & Guar. Co.,* 57 Haw. 10, 547 P.2d 1350 (1976).

"Moreover, we have specifically held that RCW 48.22.030 should receive a liberal construction in order to carry out the legislative intent and purpose. *Touchette v. Northwestern Mut. Ins. Co., supra. See also Solesski v. Oregon Auto. Ins. Co.,* 11 Wash.App. 850, 526 P.2d 68 (1974); 7 Blashfield *Automobile Law and Practice* § 274.3 at 50 (3d ed. 1966). In *Touchette,* this court stated that uninsured motorist coverage is:

> designed to protect the public from the ravages of the negligent and reckless driver. It was enacted to expand insurance protection for the public in using the public streets, highways and walkways.

*Touchette v. Northwestern Mut. Ins. Co., supra,* 80 Wash.2d at 332, 494 P.2d at 482. The court further stated at 333, 494 P.2d at 483.

> Read into the insurance contract as a public policy designed to expand uninsured motorist coverage to a significantly greater proportion of the population, the statute [RCW 48.22.030] should receive from the courts a construction that will effectuate its manifest purpose.

We followed this rule of liberal construction when we held that the 'other insurance' clause in a liability policy violated RCW 48.22.030 and RCW 48.18.130(2). *Cammel v. State Farm Mut. Auto. Ins. Co.,* 86 Wash.2d 264, 543 P.2d 634 (1975).

"Washington is not alone in refusing to give its uninsured motorist statutes a narrow and grudging interpretation which is so literal as to defeat the purpose and intent of the insurance motorist statutes. *Porter v. Empire Fire & Marine Ins. Co.,* 106 Ariz. 274, 475 P.2d 258 (1970), *modified on other grounds,* 106 Ariz. 345, 476 P.2d 155 (1970); *Palisbo v. Hawaiian Ins. & Guar. Co.,* 57 Haw. 10, 547 P.2d 1350 (1976); *Gorton v. Reliance Ins. Co. of N.Y.,* 137 N.J.Super. 558, 350 A.2d 77 (1975); *American Mut. Ins. Co. v. Commercial Union Ins. Co.,* 116 N.H. 210, 357 A.2d 873 (1976). In *Gorton v. Reliance Ins. Co., supra* 137 N.J.Super. at 563–64,

350 A.2d at 80, the court stated, regarding the New Jersey uninsured motorist statute:

> N.J.S.A. 17:28 1.1 was designed to provide some measure of protection for victims of accidents caused by uninsured motorists ... and should be construed liberally to effectuate the broadest range of protection to such automobile accident victims consistent with its language ...

This has been the preferred approach in this state, and it should not be abandoned now.

"The majority opinion here creates certain anomalies which must be addressed. Under the majority view, so long as the uninsured motorist has *some* insurance on his motor vehicle, even if less than the statutory minimum of $30,000 per accident, the motorist will not be considered uninsured. Accordingly, even when the policy proceeds are exhausted by payments to one or two of the accident victims, those victims left without payment for injuries they sustained will have no right to uninsured motorist benefits from their own uninsured motorist policy carrier. This result obtains notwithstanding the uncompensated victims have paid a premium for $30,000 per accident for uninsured motorist coverage. It follows that an accident victim covered by an uninsured motorist policy would be better off if the offending vehicle carried no insurance whatsoever.

"Moreover, an accident victim cannot even rely on having access to the $30,000 per accident liability coverage mandated by RCW 48.22.030 and RCW 46.29.490 for vehicles registered or principally garaged in this state, because out of state vehicles driven in this state are required to carry liability insurance as fixed by the laws of their own states. 7 Martindale-Hubbel Law Directory (1978) identifies three states, Oklahoma, Louisiana and Massachusetts, which require only $10,000 per accident liability insurance. Such a vehicle would not be 'uninsured' under the majority's view. Therefore a Washington state victim would be precluded from recovering benefits from his own uninsured motorist policy carrier, even if no proceeds were

available from the offending vehicle's carrier because it had exhausted the already small policy benefits in payments to other victims of the accident.

"Although certain of the cases relied on by the majority recognized the existence of these anomalies, they hold there is nothing they can do about the matter. *Detrick v. Aetna Cas. & Surety Co.*, 261 Iowa 1246, 158 N.W.2d 99 (1968); *Brake v. MFA Mut. Ins. Co.*, 525 S.W.2d 109 (Mo.App.1975). I cannot agree that this court is helpless to avoid these anomalies. As *Porter v. Empire Fire & Marine Ins. Co., supra* states, criticizing the reliance in the majority of cases on the literal definition of the word 'uninsured,' the literal approach is 'nothing more than a game of semantics which underlines the difference between the theoretical—or paper coverage—available at the time of the accident and the actual coverage upon which the insured may rely.' *Porter v. Empire Fire & Marine Ins. Co., supra,* 106 Ariz. at 278, 475 P.2d at 262.

"The court also pointed out:

Although on paper $10,000 was available to Porter, if he received in actuality only $1 he would find that the protection upon which he relied, and for which he paid premiums, disintegrates in the face of a flimsy, unrealistic excuse. ... The Uninsured Motorist Law in such instance would not afford the protection which he expected and the Legislature intended.

.  .  .  .  .  .

The uninsured policy is issued for the protection of the insured in the minimum amount provided in the Financial Responsibility Act. Otherwise, as we previously pointed out, the insured might be better off if the offending motorist had no insurance whatsoever.
*Porter v. Empire Fire & Marine Ins. Co., supra* at 279, 475 P.2d at 263.

"It was to avoid these inequities that the *Porter* line of cases adopted the rule summarized in *American Mutual Ins. Co. v. Commercial Ins. Co. of N.Y., supra* 357 A.2d at 877: An insured tort-feasor is to be considered as uninsured for the purposes of the statute to the extent that the amount available from the tort-feasor's insurer to any one injured person is less than the minimum coverage required by our financial responsibility law. ... Thus a victim of an accident having uninsured motorist coverage in the minimum amount prescribed by statute would recover his damages by a combination of payment received from an insured tort-feasor supplemented by the uninsured motorist carrier up to the limits of the coverage required by the financial responsibility act, or from the uninsured motorist carrier alone if no funds are available from the tort-feasor.... Interpreted in this manner, an insured having uninsured motorist protection would receive the coverage he could reasonably expect under the provisions of RSA 268:15–a (Supp.1975) and which the legislature intended he should receive."
*Strunk, supra,* at 216, 580 P.2d at 625–28.

I endorse and adopt the foregoing passage. Additionally, I mention again the similarity of the opinions of Justice Donaldson and Justice Shepard in the *Corgatelli* case, which should be considered with the like language of the Washington Supreme Court in *Dairyland, supra:*

In our opinion, the proper inquiry is not whether a learned judge or scholar can, with study, comprehend the meaning of an insurance contract, but whether the insurance policy contract would be meaningful to the layman who at his peril may be legally bound or held to understand the nature and extent of its coverage. *The language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense. Zinn v. Equitable Life Ins. Co.,* 6 Wn.2d 379, 107 P.2d 921 (1940).
*Dairyland, supra,* 83 Wash.2d at 358, 517 P.2d at 969.

It is important to keep in mind that our concern here is not with any language of the statute defining "uninsured motorist," there being none, but with the definition found in State Farm's contract of insur-

ance. If that policy has inconsistent provisions and terminology—as I so read it—but even if it is not so viewed, under the various opinions of this Court, Blackburn should receive the benefit of the policy provision for which he in good faith paid out his money—understanding and expecting that he was buying coverage.